FILED
United States Court of Appeals
Tenth Circuit

May 2, 2008

Elisabeth A. Shumaker
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

---

ROBERT FRANCIS QUINN,

      Plaintiff-Appellant,

v.

UNIVERSITY OF OKLAHOMA,

      Defendant-Appellee.

No. 07-6045
(D.C. No. CIV-05-396-R)
(W.D. Okla.)

---

**ORDER AND JUDGMENT**[*]

---

Before **MURPHY**, **McKAY**, and **GORSUCH**, Circuit Judges.

---

Plaintiff-appellant Robert Francis Quinn appeals the district court's grant of

summary judgment to the University of Oklahoma (University) on his claim under

the Americans with Disabilities Act (ADA).[1] The district court found that

Mr. Quinn's claim was barred by the applicable two-year statute of limitations.

---

[*] After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist the determination of this appeal. *See* Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G). The case is therefore ordered submitted without oral argument. This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

[1] In his motion for summary judgment, Mr. Quinn also claimed that he was suing under Section 504 of the Rehabilitation Act, 29 U.S.C. § 794.

Mr. Quinn argues that the district court erred in granting summary judgment on

his claim because the date that the statute of limitations began to run was a

genuine issue of fact that should have been left to a jury.  We agree that his claim

was barred and, exercising our jurisdiction under 28 U.S.C. § 1291, we affirm.

I.

In 1989, Mr. Quinn entered into a doctorate degree program in philosophy

at the University.  Dr. James Hawthorne was the chair of Mr. Quinn's dissertation

committee and his liaison to T.H. Williams, the dean of the University's graduate

school.  Mr. Quinn began the dissertation phase of his degree program in the

spring semester of 1993.  At the end of the five-year period normally given for a

doctoral candidate to complete his or her dissertation, Mr. Quinn's was

incomplete and he subsequently sought, and was granted, five consecutive

one-year extensions of the completion deadline.  The fifth extension, granted in

December 2001 and covering the 2002 school year, came with the caveat that it

would be the "final extension granted."  R., Doc. 69, Ex. 16.  When Mr. Quinn

requested a sixth extension, it was denied.  Mr. Quinn contends he did not receive

notice of this denial until April 8, 2003, in response to an e-mail to

Dr. Hawthorne indicating that he had not yet heard from Dean Williams regarding

this sixth extension request.

Mr. Quinn filed his pro se complaint on April 8, 2005, two years to the day

from the date he claims he first had actual notice of the University's denial.  The

complaint alleged the University had "refused to accomodate a long-term,

well-documented disability by denying [him] the time needed to complete [his]

dissertation." *Id.* Doc. 1 at 1.  According to his deposition, Mr. Quinn was

injured in 1970 when he lost his balance while doing a yoga headstand.

Mr. Quinn testified that a few seconds after he fell the left side of his face filled

up with excruciating pain and he started throwing up.  He testified that this first

attack subsided after two or three hours, but then he had another attack of the

same duration two or three hours later.  He testified that he has had these attacks

every day since his injury, four or five times a day, although after the first couple

of years he stopped throwing up during the attacks.  It appears the latest diagnosis

of Mr. Quinn's disability is cluster headaches, which he described as a vascular

problem.  Mr. Quinn testified that his medication regimen reduces but does not

eliminate these attacks.

> Mr. Quinn appeals pro se from the district court's grant of summary

judgment to the University.[2]

---

[2]    The district court did not consider whether to grant Mr. Quinn leave to amend his complaint to add his putative Rehabilitation Act claim.  The parties agreed that the requirements for the two claims were the same and thus his Rehabilitation Act claim, even if allowed, would also be barred by the applicable statute of limitations.

II.

Mr. Quinn claims he received actual notice of the denial of his sixth

extension request on April 8, 2003.  He argues that the date that his action against

the University accrued, and therefore the date the statute of limitations began to

run, is a material issue of fact that should have been left to the jury.

> [F]ederal law controls issues related to when federal causes of action
> accrue.  In general, under the federal discovery rule, claims accrue
> and the statute of limitations begins to run when the plaintiff knows
> or has reason to know of the existence and cause of the injury which
> is the basis of his action.  In particular, a civil rights action accrues
> when facts that would support a cause of action are or should be
> apparent.

*Alexander v. Oklahoma*, 382 F.3d 1206, 1215 (10th Cir. 2004) (citations,

quotations, and alterations omitted).  "A plaintiff has reason to know of his injury

when he should have discovered it through the exercise of reasonable diligence."

*Indus. Constructors Corp. v. U.S. Bureau of Reclamation*, 15 F.3d 963, 969

(10th Cir. 1994).

The district court held that the date Mr. Quinn received actual notice of the

University's denial was a genuine issue of material fact, but the only *reasonable*

conclusion from the undisputed evidence was that Mr. Quinn "had reason to know

of, or inquire about, the denial of his sixth extension long before April 8, 2003."

R., Doc. 108 at 5.

Summary judgment "should be rendered if the pleadings, the discovery and

disclosure materials on file, and any affidavits show that there is no genuine issue

as to any material fact and that the movant is entitled to judgment as a matter of

law." Fed. R. Civ. P. 56(c). When an "appeal arises in the context of summary

judgment, . . . we view the facts and all reasonable inferences to be drawn

therefrom in the light most favorable to the nonmoving party." *Eastman v. Union*

*Pac. R.R. Co.*, 493 F.3d 1151, 1155-56 (10th Cir. 2007). Nevertheless,

> [n]either mere assertions and conjecture, nor the existence of a
> scintilla of evidence in support of the nonmovant's position, is
> sufficient to show a genuine issue of material fact; an issue of material fact is
> genuine only if the nonmovant presents facts such that a reasonable jury could
> find in favor of the nonmovant.

*Carpenter v. Boeing Co.*, 456 F.3d 1183, 1192 (10th Cir. 2006) (citations and

quotations omitted).

In determining whether a reasonable jury could determine that the exercise

of reasonable diligence by Mr. Quinn would not have led to the discovery of the

denial until April 8, 2003, or later, we first consider how the University handled

Mr. Quinn's first five extension requests. Mr. Quinn made these requests near the

end of the fall semester each year. He claims on appeal that he would contact

Dr. Hawthorne about an extension and then Dr. Hawthorne, as chair of the

committee, would formally request the extension from the Dean's office. This is

consistent with the record in that the extension approvals were sent to

Dr. Hawthorne, and, on their face, approved *Dr. Hawthorne's* extension requests.

The record shows that Dr. Hawthorne's request that Mr. Quinn be granted

an extension through the end of the 1998 semester was granted by the Dean's

office on December 15, 1997.[3]  R., Doc. 69, Ex. 12.  The request for an extension

through the end of the 1999 fall semester was granted on December 4, 1998.  *Id*.

Ex. 13.  The request for an extension through the end of the 2000 fall semester

was granted on January 20, 2000.  *Id*. Ex. 14.  The request for an extension

through the end of the 2001 fall semester was granted on December 8, 2000.  *Id*.

Ex. 15.  Finally, the request for an extension through the end of the 2002 fall

semester was granted on December 21, 2001.  *Id*. Ex. 16.  Mr. Quinn argues that

this pattern of Dr. Hawthorne submitting formal requests at the end of the fall

semester and those requests being ruled upon in December, or in one case

January, by the Dean's office was not followed with his sixth request for

extension.  We agree.  But this does not help Mr. Quinn.

The fact that the procedures surrounding Mr. Quinn's sixth extension

varied from the previous requests is not surprising, considering the fact that the

approval of the fifth extension had specifically informed Mr. Quinn that it would

be the last.  Mr. Quinn met directly with Dean Williams on December 9, 2002, to

request a sixth extension.  In an e-mail to Dr. Hawthorne on that date, Dean

Williams stated that Mr. Quinn had come to see him to request another year-long

extension.  Dean Williams noted that the previous extension was to be *the last*,

---

[3]     On appeal, Mr. Quinn points out that the approval of his first extension
request on December 15, 1997, was conditioned on the members of the
dissertation committee approving the request.  He claims that two of the
signatures were still not received as of February 3, 1998, and therefore an
unconditional approval could not have been given until after that time.

but that he had instructed Mr. Quinn to meet with Dr. Hawthorne and provide

information as to his progress so that Dr. Hawthorne could make an assessment of

the likelihood of Mr. Quinn completing his dissertation in another year.

Dean Williams expressed to Dr. Hawthorne his willingness to grant another

extension, but only: "IF you consider he has made enough progress that he is

likely to finish next year." *Id*. Doc. 88, Ex. 9 at 2.

Four days later, Dr. Hawthorne e-mailed Mr. Quinn telling him that

Dean Williams had contacted him about reviewing Mr. Quinn's progress.

Dr. Hawthorne told Mr. Quinn that Dean Williams wanted Dr. Hawthorne's

assurance, "with a high degree of certainty," that Mr. Quinn could complete the

dissertation in a year, and that if Dr. Hawthorne could make "a really strong

argument," the Dean might be willing to grant "one more final extension."

*Id*. Doc. 96, Ex 15.  Dr. Hawthorne asked Mr. Quinn to send, "as soon as

possible," "an e-mail message saying where your dissertation presently stands,"

and to attach to that e-mail his latest draft of the dissertation.  *Id*.  Dr. Hawthorne

also incorrectly told Mr. Quinn that Dean Williams wanted a response from

Dr. Hawthorne "by early-to-mid December."  *Id*.  Receiving no response after

almost a month, Dr. Hawthorne sent another email which stated "I need to hear

from you right away if I am to have a shot at convincing the Dean to let you go

another year.  Please let me hear from you by no later than [January 13]."  *Id*.

On January 29, over two weeks after Dr. Hawthorne's second e-mail,

Mr. Quinn finally sent Dr. Hawthorne an eleven-page e-mail relating his progress.

Mr. Quinn assured Dr. Hawthorne that his tardy response was not due to an

inability to appreciate the seriousness of his academic situation but, instead, due

to the fact that his life-partner of 16 years, Vicki, had been called in for a

long-awaited double-transplant surgery on December 14, 2002.  Although that

surgery was canceled, the transplant was performed on December 20, 2002, and

Mr. Quinn was the main care-giver during his life-partner's recovery.

As to his progress on his dissertation, the e-mail related that he had made

little progress on the dissertation during the first nine years, because there was

little time between working and the disability down-time for him to do anything

else.  Mr. Quinn related that 2002, the tenth year of his dissertation, was the first

year that he had been able to "arrange [his] finances so as to . . . tak[e] a year off

from work."[4]  *Id.* Doc. 69, Ex. 5 at 3-4.

Mr. Quinn stated that he had spent the first three months of 2002

completing and updating his research.  He started writing again in April but,

between his life-partner's deteriorating health, including the fact that she

sustained two broken feet as a result of diabetes, and Mr. Quinn's own disability,

he did not complete much writing during the year.  Mr. Quinn informed

---

[4]     This comports with Mr. Quinn's deposition testimony that 2002 "was the very first year that I had to work on my dissertation, any significant time given to work on the dissertation."  R., Doc. 69, Ex. 6 at 77 (Dep. Tr. at 116).

Dr. Hawthorne that he would not be sending a draft of his dissertation because he

didn't have anything in the computer.  He claimed to have 150 hand-written pages

completed and that this was "somewhere near the half-way mark," but told Dr.

Hawthorne that "even if I were to send you what I have completed to date it

would not be of much help in securing the kind of assurances you are looking for

at this time (assuming that you could even read it in its present form)."  *Id*. at 7.

Mr. Quinn therefore went on to argue that he didn't believe that tangible

proof of his progress was necessary.  He stated that he could tell from his meeting

with Dean Williams that "it was not essential in [Dean Williams'] mind that my

sending you what I have completed to this point was the only way to go with

this."  *Id*.  Mr. Quinn told Dr. Hawthorne that the best assurance that he could

provide that he would complete his dissertation in a year was to remind

Dr. Hawthorne of how personally damaging it would be for Mr. Quinn to *not*

finish his doctorate.  Viewed in the light most favorable to Mr. Quinn, his

argument to Dr. Hawthorne for granting him an extension through 2003 was that

he would certainly finish within that year because, if he didn't:  (1) it would be a

near certainty that he would not get an extension for 2004, and (2) without an

extension he would either have to (a) "quietly walk away" from his degree, which

would have "wholly unacceptable consequences" and was "not a real option," or

(b) "contest the decision of the university to dismiss [him], taking [his] case to

the board of education, the courts, the media (20/20 News comes to mind), and

any agencies sympathetic to the plight of those who must deal with disabilities of

various kinds." *Id*. at 9.  Thus, Mr. Quinn argued:  "[t]he best assurance you have

that I will finish my dissertation by the close of this year is that the options

available to me should I not finish are so painfully unattractive so as to insure

that I will do everything humanly possible, within the bounds of my humanity, to

steer clear of those options." *Id*. at 10.  He closed with:

> I realize I have not given you anything tangible here on which to
> base a recommendation for yet another extension.  But as with many
> things in life, it is often the intangible that carries the greater weight.
> I certainly believe that to be the case in this situation where the
> intangible necessarily looms large in any assessment of the
> likelihood of my completing the dissertation by the close of this year.

*Id*. at 10-11.

On January 30, 2003, the day after Dr. Hawthorne received this e-mail from

Mr. Quinn, he, in turn, e-mailed Dean Williams.  He stated that Mr. Quinn was

"adamant" that he would finish in a year and that "[g]iven what he has

accomplished so far I believe that he could finish.  But am less certain that he will

finish, given his past record." *Id*. Doc. 88, Ex. 9 at 1.  Dr. Hawthorne

nevertheless recommended that another extension be granted, assuring Dean

Williams that the rest of the dissertation committee would concur with the

recommendation.  He closed with "[i]f, on the other hand, you decide that

[Mr. Quinn] has had enough time, I will understand.  You have kindly granted

several extensions already. I do hope, though, that you will give him one more chance." *Id*. at 2.

Dean Williams responded with an e-mail specifically asking how much progress Mr. Quinn had made in 2002, and asking for an estimate from Dr. Hawthorne as to when the dissertation would be finished. While the record does not show exactly how Dr. Hawthorne responded to this request, the last e-mail in the string was sent February 24, from Dean Williams to "Rene," and reads: "Dr. Hawthorne confirmed [Mr. Quinn] made little progress in 2002. His wife had surgery, but that was in December '02, so he should have been able to make progress earlier. I will not approve a further extension." *Id*. at 1.

Dr. Hawthorne sent Mr. Quinn a letter dated February 28, 2003, informing him that his request for a sixth one-year extension had been denied. On April 8, 2003, Mr. Quinn e-mailed Dr. Hawthorne, stating, among other things, "I still haven't heard from the Dean's office regarding my extension. If you have heard anything please let me know." *Id*. Ex. 2. Dr. Hawthorne wrote back that Dean Williams had denied the extension and that "[t]here is probably a letter in your box." *Id*. Ex. 3. Dr. Hawthorne attached to his e-mail an electronic version of the extension denial. Mr. Quinn averred that this was his first notification of the denial.

On appeal, Mr. Quinn argues that a reasonable jury could find that he exercised reasonable diligence in not inquiring about the status of his extension

request until April 8, 2003. He argues that two of the previous extension requests

had not been unconditionally approved until after the spring semester had started

and that the potential for delay was even greater with the final extension request

because he knew that Dr. Hawthorne was in Germany on sabbatical. He argues

that because he didn't provide the information requested by Dr. Hawthorne until

January 29, 2003, a jury could find that it was reasonable that he didn't inquire

until April 8, 2003, about the status of his extension request.

But this extension was not like the others. Mr. Quinn's academic future

was clearly at peril. He went to Dean Williams directly about getting yet another

extension. On December 13, 2002, Dr. Hawthorne informed him that the Dean

was open to the possibility of giving Mr. Quinn one more chance to finish, but

only if Dr. Hawthorne could "make a really strong argument" and assure the Dean

"with a high degree of certainty" that another year would be sufficient for

completion. *Id.* Doc. 96, Ex. 15.

Despite the fact that Dr. Hawthorne's December 13 e-mail inaccurately told

Mr. Quinn that Dean Williams wanted a response by early-to-mid December, and

that his second e-mail asked for a response by January 13, Mr. Quinn did not

respond or even acknowledge Dr. Hawthorne's e-mails until January 29.

Regardless of the reasonableness of this delay, the *existence* of the delay when his

academic career was on the line was clearly concerning to Mr. Quinn, as it would

have been to any reasonable person in his situation.[5]  During this time the normal

enrollment period passed for the Spring 2003 semester, and Mr. Quinn's concern

that Dean Williams would adhere to his original plan and refuse any further

extension requests could only have been heightened by the context of his eventual

response to Dr. Hawthorne's request for further information.  As the e-mail

informed Dr. Hawthorne that Mr. Quinn had nothing tangible to present for

review but nevertheless assured Dr. Hawthorne that the dissertation would be

completed in a year because, if it was not, the only real option would be to

complain to the board of education, bring administrative and court proceedings,

and go on national television, any reasonable person would have been concerned

that this was not the "really strong argument" that either Dr. Hawthorne or Dean

Williams was looking for.

    Nevertheless, despite the fact that (as Mr. Quinn had made quite clear) not

being granted a further extension would result in his either being "put out on the

street" without food or medication, R., Doc. 69, Ex. 5 at 9, or a prolonged legal

battle, there is nothing in the record that shows that Mr. Quinn did *anything* to

inquire about his fate for over two months.  The fact that Dr. Hawthorne was in

---

[5]     Mr. Quinn argues on appeal that because Dean Williams actually told
Dr. Hawthorne that he wanted a response by mid-to-late January, and
Dr. Hawthorne submitted his recommendation on January 30, Mr. Quinn's delay
had no practical effect on whether he exercised reasonable diligence.  But there is
nothing in the record to indicate that Mr. Quinn was aware of Dean Williams'
mid-to-late January deadline.

Germany would be cause for a reasonable person to exercise *more* diligence, not less.

Mr. Quinn claims that his attempt to complete a late enrollment for his two dissertation hours for the Spring 2003 semester at the very end of March, should be considered an attempt to determine whether his extension request had been approved. Mr. Quinn's actions regarding his enrollment do not rise to the level of reasonable diligence regarding his extension request, especially considering how easy it would have been to have sent an e-mail to either Dr. Hawthorne or Dean Williams. A review of Mr. Quinn's e-mail to Dr. Hawthorne regarding late enrollment reveals that when he tried to enroll late he was told that he had been "stricken from the University's records," because he had also forgotten to enroll for the fall 2002 semester. He claims that the fact that he was able to get "put back into the system," and was told he needed to get Dr. Hawthorne's permission to add the two hours, indicated to him that his request to Dean Williams had either been approved or that the decision was still pending. We see no reason Mr. Quinn would have made this assumption. There is nothing to show that he asked the registrar's office about the status of his extension request or why he thought that the office would have that information.

Consequently, we agree with the district court that no reasonable jury could find that Mr. Quinn's waiting until April 8, 2003, to inquire about his academic future was an exercise of reasonable diligence.

-14-

III.

The judgment of the district court is AFFIRMED.  Mr. Quinn's motion for

leave to proceed in forma pauperis on appeal is GRANTED.

Entered for the Court


Monroe G. McKay
Circuit Judge